IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     121 ASH ROAD, BASALT, COLORADO,
2.     APPROXIMATELY $77,888,782.61 HELD AND FROZEN IN MIRABAUD BANK ACCOUNT #509951,

      Defendants.

_____

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***
_____

COMES NOW the United States of America (the United States), by and through Matthew T. Kirsch, Acting United States Attorney, and Assistant United States Attorney Tonya S. Andrews, pursuant to Supplemental Rules for Admiralty, Maritime and Asset Forfeiture Claims G(2), and states:

<u>JURISDICTION AND VENUE</u>

1.     The United States has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. §§ 981(a)(1)(A), and (C), seeking forfeiture of the defendant property based on violations of 18 U.S.C. §§ 1956, 1957, 1343, and 1344. This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.     Venue is proper under 28 U.S.C. § 1395, as the defendant property is located and some of the acts described herein occurred in the District of Colorado.

<u>DEFENDANT PROPERTY</u>

3.     The defendant property is more fully described as:

a.  The real property, known as 121 Ash Road, Basalt, Colorado
(defendant 121 Ash Road), and all appurtenances and attachments
thereto, as deeded in three parcels via Special Warrant Deed on
December 28, 2010, recorded in Eagle County, reception number
201026240, and more fully described in "Attachment A."  Defendant
121 Ash Road is titled in the name of Henke Property, LLC, and upon
information and belief is unencumbered.

b.  Approximately $77,888,782.61 held and frozen in Mirabaud Bank
account #509951 (defendant Funds Held in Mirabaud account
#509951), held in the name of Edge Capital Investments, Ltd.  These
funds are currently subject to a restraining order issued by the Swiss
authorities at the request of the United States.

<u>FACTUAL BASIS FOR FORFEITURE</u>

4.     Except as otherwise noted, all of the following facts and information have
been discovered through my own investigation and observations, and the observations
and investigations of fellow law enforcement officers as reported to me.

<u>BACKGROUND OF INVESTIGATION</u>

***<u>Overview of Individuals and Entities</u>***

5.      Robert Smith is the Founder, Chairman, and Chief Executive Officer (CEO) of Vista Equity Partners, a large private equity firm originally headquartered in San Francisco, California.

6.      Robert Brockman (Brockman) is founder and CEO of several businesses, including Spanish Steps Holdings, Ltd.; Universal Computer Systems Holdings, Inc.; and Dealer Computer Services, Inc.  Brockman is also CEO of the Reynolds and Reynolds Company ("Reynolds & Reynolds").

7.      According to a source of information, Brockman resides in Aspen, Colorado, every year from Memorial Day to Labor Day.  Brockman's Aspen residence, known as Mountain Queen, is located just outside of downtown Aspen, Colorado.  Flight log records from Brockman's personal jet confirms he frequently travels to Aspen, Colorado.

8.      Evatt Tamine is an Australian national who currently resides in the United Kingdom, Bermuda, and Australia.  Various documents list Evatt Tamine as the trustee, director, or manager of various entities controlled by Brockman.

9.      Spanish Steps Holdings, Ltd. is a British Virgin Islands-based entity owned by the A. Eugene Brockman Charitable Trust.   Spanish Steps Holdings, LLC, also owned by the A. Eugene Brockman Charitable Trust, controls and holds all shares of Spanish Steps Holdings, Ltd. (collectively "Spanish Steps").  The Director of Spanish Steps is Evatt Tamine.

10.     Universal Computer Systems Holdings, Inc. ("Universal Computer Systems") was founded by Brockman and is 93% owned by Spanish Steps. Universal

Computer Systems, which is headquartered in Houston, Texas, is the parent holding company for Dealer Computer Services, Inc. and Reynolds & Reynolds.

11.     Reynolds & Reynolds is a leading provider of integrated software solutions for automotive dealerships headquartered in Ohio. In 2006, Reynolds & Reynolds was acquired by Universal Computer Systems.  Prior to the 2006 acquisition, Reynolds & Reynolds was a competitor of Universal Computer Systems.

12.     Edge Capital Investments, Ltd. is a Nevis corporation.  Evatt Tamine is the Director of Edge Capital Investments, Ltd.  According to Tamine, Edge Capital Investments, Ltd. was set up in the 1990s by the Massengill Children's Trust, in order to shield Brockman's actual ownership interest in Edge Capital Investments, Ltd.  According to Tamine, the original source of funds for Edge Capital Investments, Ltd. came from another Brockman-owned entity named Computer Terminals, Ltd., which is a defunct Cayman Islands-based company that previously manufactured and sold IT equipment. Upon its liquidation in the late 1990s, there was a substantial sum of money that was donated to an offshore structure that includes present day Edge Capital Investments, Ltd.

13.     Similar to Edge Capital Investments, Ltd., Point Investments, Ltd. was set up in the British Virgin Islands in 1999 by the Massengill Grandchildren's Trust, in order to shield Brockman's actual ownership interest in Point Investments, Ltd. Per an email dated May 10, 2014, from Brockman to Tamine regarding the original source of funds for Point Investments, Ltd., Brockman advised that it came from a substantial distribution in the 1990s from Universal Computer Systems.  In 2009, Point Investments, Ltd. was moved to Bermuda.

14.     Both the Massengill Children's Trust and the Massengill Grandchildren's Trust were originally set up by Don Jones, the former Chief Financial Officer (CFO) of Universal Computer Systems.  Melissa Jones, wife of Don Jones, has the maiden name Melissa Massengill.

### ***Overview of Bank and Wire Fraud Scheme***

### ***2006 Reynolds & Reynolds Acquisition***

15.     In 2006, Reynolds & Reynolds was acquired by Universal Computer Systems, a company founded by Brockman.  Prior to the purchase, Reynolds & Reynolds was a competitor of Universal Computer Systems.

16.     Disclosures filed with the U.S. Securities and Exchange Commission (SEC) indicated that the total purchase price for Reynolds & Reynolds in 2006 was approximately $2.4 billion. Closing documents for the purchase show that $387 million was paid in cash, and approximately $2.1 billion was borrowed—by Universal Computer Systems—for the acquisition of Reynolds & Reynolds.

17.     Of the $387 million paid in cash for the purchase of Reynolds & Reynolds, $50 million came from Vista Equity Fund II, a fund held by Vista Equity Partners.[1]  Vista Equity Partners subsequently owned approximately 3% of Reynolds & Reynolds.  Upon this acquisition, Robert Smith, the CEO of Vista Equity Partners, also became a board member of Reynolds & Reynolds and was actively involved in the negotiations with Deutsche Bank's original financing and subsequent refinancing, including the debt buyback proposals.

---

[1] At the time, Point Investments, Ltd. was the sole limited partner in Vista Equity Fund II.

18.     The remainder of the cash paid for the purchase of Reynolds & Reynolds, approximately $337 million, came from Spanish Steps. SEC disclosures further revealed that Spanish Steps was listed as the entity that would own the stock in Reynolds & Reynolds.  During this time, the director of Spanish Steps was Evatt Tamine.

19.     Deutsche Bank AG New York was the primary lender that financed the acquisition of Reynolds & Reynolds.  The purchase was financed through three Credit Agreements with Deutsche Bank as follows:

- First Lien Credit Agreement – Credit Facility = $1,377,000,000

- Second Lien Credit Agreement – Credit Facility  = $520,000,000

- Third Lien Credit Agreement – Credit Facility  = $250,000,000

20.     All three Credit Agreements, dated October 26, 2006, were signed by Robert Brockman as CEO of Universal Computer Systems Holdings, Inc., the parent holding company for Dealer Computer Services, Inc. and Reynolds & Reynolds.

21.     The Second and Third Lien Credit Agreements include a pro rata payment provision.  According to Section C. General Provisions Regarding Payments of the Reynolds & Reynolds Credit Agreements, "paragraph (iii) **Apportionment of Payments - Aggregate principal (including prepayments), interest and prepayment premium payments in respect of Term Loans shall be apportioned among all outstanding Term Loans to which such payments relate, proportionately to Lenders' respective Pro Rata Shares**.  Administrative Agent shall promptly distribute to each Lender, at the account specified in the payment instructions delivered to Administrative Agent by such

Lender, its Pro Rata Share of all such payments received by Administrative Agent when received by Administrative Agent."

22.     The Administrative Agent on all three credit agreements was Deutsche Bank, AG in New York.

23.     Based on the pro rata provision, the Second and Third debt of Reynolds & Reynolds could not be purchased by the borrower (Universal Computer Systems Holdings, Inc. or Reynolds & Reynolds) without approval of the First Lien Debt holder. This is because a purchase of the Second and Third debt by a borrower would have resulted in the borrower making preferential or non-pro-rata payments to the Second and Third debt lenders over the First debt lender which, therefore, would have violated the pro-rata apportionment of payments set forth in those agreements.

24.     In addition, the Second and Third Lien Credit Agreements for Reynolds & Reynolds defined the term "Affiliate."   According to Section 1, the term "Affiliate" was defined as "any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, 'control' . . . means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise."

25.     The Second and Third Lien Credit Agreements for Reynolds & Reynolds also defined **"Eligible Assignee," that is an individual or entity that may be assigned the debt,** in relevant part, as **"**(i) any Lender, any Affiliate of any Lender and any Approved Fund of any Lender; and (ii) (a) a commercial bank organized under the laws

of the United States or any state thereof; (b) a savings and loan association or savings bank organized under the laws of the United States or any state thereof; (c) a commercial bank . ..  (d) any other entity that is an "accredited investor" . . . ; **provided that neither Company nor any Affiliate of Company shall be an Eligible Assignee.**

26.     Thus, based on the definitions of "Affiliate" and "Eligible Assignee," and the terms of the Credit Agreements, Brockman was prohibited from purchasing the Second and Third Lien Debt through an Affiliate corporation because they would not be an "Eligible Assignee."

***Brockman/Tamine Emails***

27.     Beginning in 2008, Tamine and Brockman arranged to purchase Reynolds & Reynolds Second and Third lien debt in the secondary debt market without disclosing Brockman's affiliation with Reynolds & Reynolds, thereby defrauding Deutsche Bank and other debt holders in the secondary debt market.

28.     In October 2008, Michael Henry, Managing Director at Deutsche Bank's Manhattan, New York office, emailed numerous clients of Deutsche Bank, regarding investment opportunities in the debt market.  As part of this initiative, he initially emailed both Brockman and Smith as representatives of the shareholders of Reynolds & Reynolds on October 8, 2008, informing them that there was an opportunity to buy Reynolds & Reynolds debt at market levels, below par.  As discussed *infra*, Deutsche Bank made it clear, however, that Spanish Steps would not be eligible to repurchase as an affiliate unless the term "Eligible Assignee" was amended in all three credit agreements in order

8

to allow affiliates to repurchase the debt on the open market. Such an amendment would have required a 51% majority vote under each respective credit agreement.

29.     After receiving the October 8, 2008, email from Michael Henry at Deutsche Bank about the purchasing of debt, Brockman and Evatt Tamine exchanged numerous emails regarding the purchase of the Reynolds & Reynolds debt.

30.     On or about December 9, 2008, Brockman sent Tamine an encrypted email regarding the possibility of buying the Reynolds & Reynolds debt.  In the email, Brockman stated "We are hearing on the street that Reynolds 2nd Lien debt is trading in the 30-odd cents to the dollar range.  This is LIBOR plus 5.5% paper – which would yield 7.5% x 3 = 22.5% yield with a 3X return when paid off.  This fact plus it now looks like Reynolds to buy its own debt would be nigh on impossible due to the necessity of getting 100% agreement from the first lien holders – makes this worth a further look.  Please talk to the new tax lawyer – lay out for him the structure of it being done through a mutual fund that invests in a US partnership.  No names, just how it works... Hopefully when the loan gets repaid, it would all be long term capital gains – with no tax.  This may be the way we can recoup some of the beating from this year.  Bob."

31.     In December 2008, Brockman and Tamine exchanged emails discussing the plan to buy Reynolds & Reynolds debt on the secondary market.  In particular, on or about December 29, 2008, Brockman sent Tamine another encrypted email regarding his plan to repurchase debt.  In this email, Brockman wrote "Evatt, Please see the attached debt purchase plan.  Bob." The attachment to the December 29, 2008 email, laid out a proposed plan to buy the Reynolds & Reynolds Second and Third debt.  Specifically, it

stated that Edge Capital Investments, Ltd. would likely be the purchasing entity to buy the Second and Third lien debt at 35% of par value.  Brockman also noted that because of the total indebtedness of Reynolds & Reynolds, refinancing the remaining debt would be easier to accomplish, and difficult or impossible if the Reynolds & Reynolds debt was not reduced.

32.     In January 2009, Brockman and Tamine continued to exchange emails regarding the effect of the Reynolds & Reynolds debt purchase plan.  Specifically, on January 8, 2009, Brockman noted that Tamine had previously commented that buying back Reynolds & Reynolds debt would be troublesome.  Brockman also added further thoughts about the Reynolds & Reynolds debt, stating in an email to Tamine, "I anticipate that there will be a substantial goodwill write-down at Reynolds – which while it has nothing to do with EBITDA or cash flow - will create a huge accounting loss for the year - which will further dampen the spirits of the lienholders - and cause more debt to be available - and possibly at even deeper discounts."

33.     On or about January 10, 2009, Brockman sent Tamine an encrypted email. In this email, Brockman stated, "Evatt, I agree that you should proceed to open an account with DB and proceed to buy some 2nd and 3rd lien debt out of Edge.  Hopefully prices (discounts) and availability will eventually be good - so that all of the second and third lien debt can be purchased.  This project has the potential to recoup the losses of 2008 plus ensure the safety of Reynolds."

34.     On or about March 9, 2009, Brockman sent Tamine an encrypted email which stated, "I have no specific requests regarding the debt purchase record-keeping.

My goal is simple - at the end of the day to own all the 2nd and 3rd lien debt straight out - and to have purchased it at substantial discounts.  Please do whatever you deem necessary to keep track of it all - as it will need to be set up in the books as assets.  We will also need to keep track to make sure that we get all of the interest income that we are due.  If we are fortunate enough to be successful, there will be substantial interest income that perhaps we can begin to devote to purchase of first lien debt.  At 25% - the third lien debt will yield 32%.  At 30%, the second lien debt will yield 20%.  Bob."

***Emails from Deutsche Bank to Brockman and/or Robert Smith***

35.     On March 11, 2009, Michael Henry, Managing Director at Deutsche Bank's New York office, again emailed Robert Smith and Bob Brockman a 7-page presentation entitled Loan Repurchase Follow-Up Discussion Materials.

36.     The proposal indicated that Deutsche Bank believed that $125 million of face value debt was available for repurchase over the course of multiple tenders, or rounds of purchasing.  The top 25 list of Second and Third lien debt holders indicated that Farallon Capital Management, LLC and Deutsche Bank were the two largest lien holders; holding approximately $101 million and $49 million, respectively.  Brockman emailed Tamine on March 12 and 14, 2009, acknowledging receipt of this 7-page proposal.

***Mechanics of the Buy Back Scheme***

37.     No amendments to the credit agreements were obtained by Brockman to permit an affiliate to purchase the Reynolds & Reynolds debt on the secondary debt market.

38.     However, between March 5, 2009 to April 22, 2009, Brockman and Tamine began to purchase Reynolds & Reynolds Second and Third lien debt through Edge Capital Investments, Ltd., without disclosing that Edge Capital Investments, Ltd. was an affiliate of Reynolds & Reynolds.

39.     On January 10, 2009, Brockman emailed Tamine and stated, "I agree that you should proceed to open an account with Deutsche Bank and proceed to buy some 2nd and 3rd lien debt out of Edge Capital.  Hopefully prices (discounts) and availability will eventually be good - so that all of the second and third lien debt can be purchased."

40.     On January 15, 2009, Tamine submitted to Deutsche Bank a false account opening application for Edge Capital Investments, Ltd., concealing Brockman as the true beneficial owner.  In the account opening documents, Tamine informed Deutsche Bank that his client was a company called Edge Capital Investments, Ltd., which was owned by a fully discretionary trust.  Tamine further advised that the trust had a corporate Trustee, who had full discretion in relation to the trust assets and that no beneficiary had any expectation, claim or right, to any of the trust assets.

41.     According to Tamine, on paper the Trustee that oversaw Edge Capital Investments, Ltd. was an individual named Crispin Ruffel-Smith ("Ruffel-Smith"); however, Ruffel-Smith had no real authority.  Ruffel-Smith resided in the British Virgin Islands, owned a tool rental shop and served purely as a nominee.  Ruffel-Smith took direction from Tamine and would sign documents as instructed in order to make it appear that Brockman was not involved.

42.     On January 26, 2009, Paul Ardire, an employee of Deutsche Bank advised Tamine that the account in the name of Edge Capital Investments, Ltd. was active and that he could begin trading. According to Paul Ardine, he believed that Tamine represented a Swiss family, or Swiss endowment, and that Tamine was interested in purchasing the debt of U.S. companies, including Reynolds & Reynolds.

43.     On January 27, 2009, Brockman emailed Tamine and said, "We first want to focus on the third lien debt.  On February 15th all debt holders will receive un-audited year end financials which show deteriorating situation.  We will have a billion dollar write down of goodwill forced on us by the auditors causing substantial non-operating loss. From a timing standpoint, we would be best served by starting the offer before that date."

44.     On February 8, 2009, Brockman wrote in Tamine's 2008 employee performance review that the project of highest priority for 2009 was to successfully purchase all of the Second and Third Reynolds & Reynolds lien debt at the current deeply discounted prices.

45.     On February 11, 2009, Brockman emailed Tamine the following: "Regarding the offer for third lien debt.  From what you have learned, the best guess is that there are two large holders of third lien debt on the west coast.  With $250M face value outstanding, they both could have very large pieces.  My further guess is that if they want to get rid of some of it, they probably want to get rid of all of their piece.  Therefore an offer large enough to take them completely out is probably more attractive than one that leaves them with a remnant… Therefore I am thinking that we should offer to buy up to $100M face value at 20% of face value – making our investment $20M… For now we

should focus on the 3rd lien debt only – as it sounds like the 2nd lien debt does not trade that much at the 35% numbers – however I expect that will change as our Q4 numbers, pension plan underfunding of $95M, goodwill write down of $1.2B, and 2009 plan come out."  Brockman advised Tamine that they needed to make a large enough initial offer to induce Farallon Capital Management, LLC to sell their debt.

46.     On February 11, 2009, Brockman emailed Tamine that he didn't "want to go for the whole 3rd lien debt at once.  We need to keep Deutsche Bank in the dark as much as possible."

47.     As agreed, Tamine emailed Deutsche Bank on February 17, 2009, with an offer to purchase $100 million of the Third lien debt from Farallon Capital Management, LLC at 20 cents on the dollar.

48.     On March 5, 2009, Brockman emailed Tamine to take $11 million at 26.5 offered by Deutsche Bank.  Tamine then emailed Deutsche Bank that his client wished to take the $11 million at 26.5.  This led to the first contract to purchase the Third lien debt from Farallon Capital Management, LLC.

49.     On March 9, 2009, as noted above, Brockman emailed Tamine, "My goal is simple - at the end of the day to own all the 2nd and 3rd lien debt straight out - and to have purchased it at substantial discounts."

50.     On March 19, 2009, Brockman emailed Tamine regarding Robert Smith's ideas to pursue a massive debt repurchase, including the First lien debt, with a complete refinancing.  Brockman wrote, "If it has legs will send you details.  Conceptually very much

like DB documents I already sent you - except for all the outstanding debt.  I don't want to change anything you are doing."

51.    Between March 4, 2009, and April 22, 2009, at Brockman's direction, Tamine entered into nine additional trades of Reynolds & Reynolds debt.

52.    In total, Tamine, through Edge Capital Investments, Ltd., and at the direction of Brockman, executed 10 trades in Reynolds & Reynolds Second and Third lien debt as follows:

| Reynolds & Reynolds Debt<br>Detailed Schedule of Debt Purchased | | | | | | | |
|---|---|---|---|---|---|---|---|
| Trade No. | Trade Date | Lien Traded | Face Value | Purchase Discount | Purchase Price | Settlement Date | Upstream Seller |
| 1 | 03/05/2009 | 3rd | $10,228,750.00 | 26.50% | $2,710,618.75 | 04/062009 | Farallon Capital |
| 2 | 03/09/2009 | 2nd | $1,000,000.00 | 30.00% | $300,000.00 | 04/06/2009 | Future Fund Board of Guardians |
| 3 | 03/08/2009 | 3rd | $6,921,500.00 | 25.00% | $1,730,375.00 | 04/06/2009 | Farallon Capital |
| 4 | 03/16/2009 | 2nd | $7,000,000.00 | 30.00% | $2,100,000.00 | 05/14/2009 | Van Kempen; Morgan Stanley |
| 5 | 03/20/2009 | 2nd | $9,500,000.00 | 26.00% | $2,470,000.00 | 04/24/2009 | Ares Enhanced Credit Opportunities; SEI Institutional -High Yield Bond Fund |
| 6 | 03/30/3009 | 2nd | $4,500,000.00 | 33.00% | $1,485,000.00 | 06/24/2009 | UBS AG- Stamford Branch |
| 7 | 03/30/2009 | 2nd | $3,000,000.00 | 33.00% | $990.000.00 | 08/07/2009 | Alaske CBNA Loan Funding LLC; Silver Lake Credit Fund LP |
| 8 | 03/04/2009 | 2nd | $6,000,000.00 | 35.00% | $2,100,000.00 | 08/27/2009 | Bank of America; Carlyle High Yield Partners IV, Ltd. |
| 9 | 04/22/2009 | 2nd | $9,000,000.00 | 35.00% | $3,150,000.00 | 07/22/2009 | Laodiccea II, LLC |
| 10 | 04/22/2009 | 2nd | $10,427,204.92 | 35.00% | $3,649,521.72 | 07/22/2009 | Laodiccea II, LLC |
| | | | | | | | |
| | | | 67,577,454.92 | | 20,685,515.47 | | |

53.    Tamine, at Brockman's direction, executed and delivered fraudulent Assignment & Assumption agreements to Deutsche Bank for all 10 of the Reynolds & Reynolds debt trades listed in the above schedule.  Tamine falsely affirmed that Edge Capital Investments, Ltd. was an "Eligible Assignee" as defined in the Second and Third

lien credit agreements, when in fact, Tamine was purchasing the debt on behalf of Brockman, who was not permitted to purchase the debt, since Brockman is an affiliate of Reynolds & Reynolds.

***Reynolds & Reynolds Failed to Disclose the Affiliate Purchase by Edge Capital Investments, Ltd. on Ernst & Young Audited Financial Statements – 2008 and 2009***

54.     Pursuant to Reynolds & Reynolds's Second and Third lien credit agreements, Reynolds & Reynolds was required to obtain quarterly Compliance Certificates certifying that Reynolds & Reynolds was not aware of any conditions or events that constitute an Event of Default or Potential Event of Default.

55.     On November 15, 2009, Ken Bunney, CFO of Reynolds & Reynolds, and Wayne Matteson, Treasurer of Reynolds & Reynolds, signed Second and Third Lien Compliance Certificates, affirming that there had been no violations of the credit agreements.

56.     Deutsche Bank personnel distributed the Compliance Certificates to all creditors, via Intralinks. Intralinks is a cloud-based financial technology provider for global banking, deal making, and capital markets. Farallon Capital Management, LLC was a recipient of the Second and Third Lien Compliance Certificates.

57.     The credit agreements also required Reynolds & Reynolds to obtain a "clean," unqualified opinion of its annual audited financial statements from its auditor Ernst & Young, as well as an Auditor Debt Compliance Report, stating whether any conditions or events that constitute an Event of Default or Potential Event of Default had come to Ernst & Young's attention during their audit.

58.     Ernst & Young audited Reynolds & Reynolds's 2008 and 2009 annual financial statements and provided a "clean," unqualified opinion that the financial statements were presented fairly, in all material respects, and that the financial position and results of operations and related cash flows for the years then ended are in conformity with generally accepted accounting principles. However, a review of the financial statements indicates that Brockman's debt buyback plan, and subsequent purchases of Second and Third lien debt, were not disclosed anywhere in the financial statements.

59.     As part of the 2008 year-end auditing procedures, the audit team personnel from Ernst & Young interviewed Reynolds & Reynolds's management.  Brockman was aware of the ongoing audit procedures performed by Ernst & Young, culminating upon his signing of a Management Representation letter as one of the final requirements for obtaining an unqualified audit opinion.

60.     The Management Representation Letter, signed by Brockman on March 25, 2009, contained the following acknowledgements and related misrepresentations (the operative statements are bolded):

>   a. We recognize that obtaining representations from us concerning the information contained in this letter is a significant procedure in enabling you to form an opinion whether the consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of Reynolds & Reynolds in conformity with US generally accepted accounting principles.

b. Certain representations in this letter…, **if they involve an omission** or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the **omission** or misstatement.   Accordingly, we make the following representations, which are true to the best of our knowledge and belief.

c. **We have no plans** or intentions that may materially **affect the carrying value** or classification of assets and **liabilities**.

d. **Related Party Transactions:** Transactions with related parties, as defined in Statement of Financial Accounting Standards No. 57, Related Party Disclosures, and related amounts receivable or payable, including sales purchases, loans, transfers, leasing arrangements and guarantees, **have been properly** recorded and/or **disclosed** in the consolidated financial statements.

e. We have **no knowledge of any fraud or suspected fraud involving management** or other employees who have a significant role in the Company's internal control over financial reporting.

f. We have disclosed to you all allegations of financial improprieties, including fraud or suspected fraud, coming to our attention.

g. **Subsequent Events:** Subsequent to December 31, 2008, **no events or transactions have occurred or are pending** that would have a material effect on the consolidated financial statements at that date or for the period

then ended, or **that are of such significance** in relation to the Company's affairs to **require mention in a note to the consolidated financial statements** in order to make them not misleading regarding the consolidated financial position, results of operations or cash flows of the Company.

61.     On March 26, 2009, Ernst Young signed the Reynolds & Reynolds audit opinion letter and issued the 2008 Audit and Report on Compliance.

62.     On March 31, 2009, the signed 2008 Audit and Report on Compliance letter, and the 4th Quarter 2008 Reynolds & Reynolds Debt Compliance Certificates, were sent to Deutsche Bank.

63.      The next day, April 1, 2009, Reynolds & Reynolds's 2008 Financial Information was posted to Intralinks.

***Reynolds & Reynolds Refinance***

64.     On February 17, 2010, Brockman emailed Tamine and advised that Deutsche Bank had just called him, and Brockman thinks "it was time to refinance." Brockman said that the term sheet was almost perfect.  Brockman said that Robert Smith was going to engineer a bidding process between Deutsch Bank, Credit Suisse, and Bank of America.

65.     On February 24, 2010, Brockman emailed Tamine and informed him that Deutsche Bank offered the best deal and that Brockman was going to discuss this with Robert Smith the following day.

66.     On February 26, 2010, Tamine emailed Brockman to congratulate him. Tamine wrote that he assumed Robert Smith did not know that they hold some of the Reynolds & Reynolds debt.  Tamine informed Brockman he was having dinner with Smith and the topic may come up.  Brockman responded by email to Tamine stating "Robert does not know we hold any debt and should not be told."

67.     On March 15, 2010, Deutsche Bank was notified by Robert Smith that they were awarded the "Lead-Left" role for the underwriting of Reynolds & Reynolds' new refinancing.  This meant that Deutsche Bank became the lead bank within the new loan syndicate.

68.     Once the terms of the new financing with Deutsche Bank were finalized, Brockman worked over the next several weeks with various representatives from Deutsche Bank to provide due diligence materials and prepare a "Bank Book" and a Lender's Presentation in order to market the debt offering.  The "Bank Book" is a term used in finance to describe the Confidential Information Memorandum that is prepared containing information on the borrower, the borrower's industry, loan terms, and the borrower's financial projections.

69.     On April 1, 2010, Tamine sent Brockman a copy of Deutsche Bank's announcement for the Lenders Presentation to occur in New York City on April 6, 2010. Tamine advised Brockman that he will not participate, since Ken Bunney, Chief Financial Officer (CFO) of Reynolds & Reynolds, will be in attendance.

70.     A review of the loan terms indicated that Reynolds & Reynolds was borrowing approximately $1,820,000,000 that was to be used, in portion, to pay off the

existing Second and Third lien debt in the face amount of $520,000,000 and $250,000,000, respectively, including the approximately $67 million that had been purchased and held by Brockman through Edge Capital Investments, Ltd.

71.     On April 21, 2010, Tamine received a wire transfer of $67,835,129.00 to Edge Capital Investments, Ltd.'s Bermuda Commercial Bank.   This wire represented proceeds from the refinancing of Reynolds & Reynolds's debt in furtherance of the scheme.

<u>FINANICAL ANALYSIS OF FRAUD PROCEEDS</u>

72.     On or around September 16, 2008, Edge Capital Investments, Ltd. opened an account at Bermuda Commercial Bank in Bermuda.  A review of the account opening documentation reveals that the beneficial owner of the account was listed as the Massengill Children's Trust.  Subsequent to the account opening, Tamine was added as an authorized signor.

73.     During 2009 and up through April 21, 2010, at least $72,335,129.00 in proceeds from the Reynolds & Reynolds debt buyback scheme were deposited into Edge Capital Investments, Ltd.'s Bermuda Commercial Bank account.    Specifically, $4,550,186.00 in interest payments from Reynolds & Reynolds were made into Edge Capital Investments, Ltd.'s Bermuda Commercial Bank Account from April 2009 through April 2010.   On April 21, 2010, $67,835,129.00 was deposited into Edge Capital Investments, Ltd.'s Bermuda Commercial Bank Account as the payoff of the newly re-financed debt.

74.     In July 2010, Brockman and Tamine exchanged a number of emails regarding the structure of Edge Capital Investments, Ltd. and how the acquired debt sale proceeds might be used.  In one email, Brockman noted that "[f]rom a security standpoint, I think that everything should not be rolled together this tightly. The two principal entities that we are talking about cleaning up need to kept separate [sic] from the AEBCT structure. We can never tell what crazy things the house is going to do – and AEBCT is exposed to them. These other two structures need to be kept way in the background with separate charitable trusts, trust protectors, and underlying companies."  The reference to the "the house" is believed to be the Internal Revenue Service and "AEBCT" is believed to be an acronym for the A. Eugene Brockman Charitable Trust, which Brockman noted was already known to the Internal Revenue Service.  Based on travel records, Brockman appeared to be in Colorado when these email exchanges occurred.

75.     The Reynolds & Reynolds fraud proceeds were then used in additional financial transactions, relating to other companies owned and controlled by Brockman and Tamine, including $15 million used for the purchase and improvements to defendant 121 Ash Road.

***Purchase and Development of Defendant 121 Ash Road***

76.     As stated above, between June 19, 2009, and April 21, 2010, approximately $72,335,129.00 in proceeds from the Reynolds & Reynolds debt buyback scheme were deposited into Edge Capital Investments, Ltd.'s Bermuda Commercial Bank account. These funds remained in this account and on December 16, 2010, $15 million of fraud proceeds was transferred from Edge Capital Investments, Ltd.'s Bermuda Commercial

Bank account number 06-801-200703-01 to Regency Management Ltd.'s Bermuda Commercial Bank account number 06-801-200717-01.[2]

77.     The $15 million in funds from the debt buyback scheme were used by Regency Management Ltd. to acquire land and develop a fishing lodge along the Frying Pan Canyon River near Basalt, Colorado.  Tamine advised that Brockman directed him on all aspects of the development, including the closing of the land purchase and subsequent funding of the improvement costs.

78.     The property is titled in the name of Henke Property, LLC.  Henke Property, LLC, on paper, is 100% owned by Henke Holdings, LLC.  Both entities were formed in Colorado on September 7, 2005, at the direction of Brockman.  Carl Linnecke, a CPA in Aspen, Colorado that works at the direction of Tamine, assisted Don Jones, the former CFO of Universal Computer Systems, and Tamine with incorporating Henke Property, LLC and Henke Holdings, LLC.  Both Don Jones and Tamine took direction from Brockman.

79.     Henke Holdings, LLC is 100% owned by Regency Management, Ltd., a British Virgin Islands entity incorporated on March 28, 1996, at the direction of Don Jones and Brockman.  According to Tamine, Regency Management, Ltd.'s purpose was to hold the Colorado real properties and obscure Brockman's ownership interest.

---

[2] A financial analysis of Edge Capital Investments, Ltd.'s Bermuda Commercial Bank account number 06-801-200703-01 shows that the account balance on April 21, 2010 was $72,451,847.00. The account balance on December 16, 2010 was $72,035,743.00, prior to the $15 million transfer made that day.

80.     Records obtained from Eagle County Title, including a Statement of Settlement dated December 28, 2010, reflect that Henke Property, LLC acquired defendant 121 Ash Road as three parcels near Basalt, Colorado: 121 Ash Road, 9801 Frying Pan Road, and 17.22 acres along Frying Pan Canyon Road.  The contract sales price was $5 million.

81.     The escrow documents further reflect wire transfers of $265,000.00 on December 17, 2010 and $4,731,019.00 on December 23, 2010, from Regency Management Ltd., through its Bermuda Commercial Bank Account, to the seller of defendant 121 Ash Road.

82.     From May 25, 2011 through August 27, 2014, 28, wire transfers totaling $10,550,000.00 were initiated from Regency Management's Bermuda Commercial Bank account #06-801-200717-01 to Henke Property, LLC's Wells Fargo account number 9042-018029.  These funds were used for improvements to defendant 121 Ash Road, all of which constituted proceeds from the Reynolds & Reynolds debt buyback scheme.

83.     Regency Management, Ltd. owns another Colorado entity named Mountain Queen, Inc., which, in turn, owns Brockman's Aspen vacation home, named "Mountain Queen."  The "Mountain Queen" residence is located at 230 McFarlane Gulch Road, Aspen, Colorado.

84.     Brockman spends a significant portion of each year living in Aspen, Colorado.

85.     Tamine advised that he is clear that it was Brockman's idea to buy this property and make improvements on the land. The main purpose of acquiring this

property was to restore the land to facilitate good fishing for Brockman. Tamine would provide instructions on this property to Carl Linnecke and funnel questions from Linnecke up through Brockmagn.  Carl Linnecke acted as a property manager for both defendant 121 Ash Road and Brockman's Aspen residence, "Mountain Queen."

86.    This evidence all demonstrates that Brockman is the true owner of defendant 121 Ash Road, but he makes annual lease payments to Henke Property, LLC for use of the property.  Tamine initiated or authorized the wire transfers for the lease payments to Henke Property, LLC.

***Defendant Funds Held in Mirabaud Bank Account #509951***

87.    As described more fully below, proceeds of the Reynolds & Reynolds debt buyback scheme, totaling $15 million, were used to fund the debt recapitalization of a company called SumTotal Systems through Vista Equity Partners Fund III.

88.    In July 16, 2007, Point Investments, Ltd. became a limited partner in Vista Equity Partners Fund III (Parallel), LP.  As discussed *supra*, in 1999, Don Jones and Brockman set up Point Investments, Ltd. ("Point Investments") in the British Virgin Islands (later moved to Bermuda in 2009) using the Massengill Grandchildren's Trust as a cover to shield Brockman's ownership interest in the Point Investments Ltd. structures.

89.    Included in the documents submitted by Point Investments to become a limited partner in Vista Equity Partners Fund III was a W8-BEN, which is an IRS document for certification of status of beneficial owner for United States tax withholding and reporting for entities.  This W8-BEN asserted that Point Investments was a non-US investor subscribing to the Vista Equity Partners Fund III investment.  In reality, Point

Investments was a front to conceal Brockman's ownership interest.  Tamine advised that this was done so that Brockman would avoid taxation by the United States.  Tamine advised that he had completed other W8-BENs in the name of Point Investments in the same manner and for the same purpose.

90.     In July 2009, Vista Equity Partners Fund III acquired SumTotal Systems, which became a part of Vista Equity Partners Fund III, LP's portfolio of technology companies.  Vista Equity Partners Fund III is in the business of investing in and acquiring technology-related companies.

91.     On October 24, 2012, Tamine emailed Brockman and advised him that Robert Smith, CEO of Vista Equity Partners, had proposed a refinancing of SumTotal Systems and offered Tamine $50 million of the new debt in SumTotal Systems at attractive interest rates if he were interested.   The proposed "SumTotal Debt Recapitalization" would essentially raise new and additional debt, the proceeds of which would then be used to extinguish the current debt and pay a dividend to existing shareholders.

92.     On October 25, 2012, Tamine emailed Brockman with more information about the SumTotal debt offering and recommended using cash from Edge Capital Investments Ltd. to purchase the debt.  Brockman approved Tamine's recommendation on the same day.

93.     On November 1, 2012, Edge Capital Investments, Ltd. wired $9,900,000.00 from its Bermuda Commercial Bank account to Bank of America (New York, NY) account #1366210008929 in the name of Par Primary Trading (ref: SumTotal Systems).  At the

time of this transfer, approximately $15 million in funds traceable to the Reynolds & Reynolds debt buyback scheme were held in Edge Capital Investments, Ltd.'s Bermuda account.  Accordingly, these funds were comprised of Reynolds & Reynolds debt buyback proceeds.  These funds were used to purchase the first lien debt belonging to SumTotal Systems and held by Edge Capital Investments, Ltd.

94.     On the same day, November 1, 2012, Edge Capital Investments, Ltd. wired $39,200,000.00 from its Bermuda Commercial Bank to Bank of America (New York, NY) account number 1366210008929 in the name of Par Primary Trading (ref: SumTotal Systems) to purchase the second lien debt belonging to SumTotal Systems.  As noted above, at the time of this transfer, approximately $15 million in funds traceable to the Reynolds & Reynolds debt buyback scheme were held in Edge Capital Investments, Ltd's Bermuda Commercial Bank account.  Thus, after the initial transfer of $9,900,000.00 on the same day, $5,100,000.00 of the $39,200,000.00 transfer was comprised of Reynolds & Reynolds debt buyback proceeds.

95.     On November 16, 2012, Tamine emailed Brockman and advised that the SumTotal Systems debt recapitalization was closing the next day and that Point Investments, as a shareholder in Vista Equity Partners Fund III, would be receiving approximately a $28.5 million distribution. Tamine indicated that the $28.5 million distribution to Point Investments was coming out of the proceeds of the $50 million debt purchase that Edge Capital Investments, Ltd. made in SumTotal Systems; so the net difference (i.e. cash outlay) had been minimized in order to put "cash to work with some good returns."

***Edge Capital Investments, Ltd. Received Returns on Proceeds from SumTotal Systems Debt***

96.     From April of 2013 through September of 2014, Edge Capital Investments, Ltd. received approximately $8 million in interest payments from the SumTotal Systems first and second lien debt investment. These payments were deposited into Edge Capital Investments, Ltd.'s account at Bermuda Commercial Bank.

97.     On October 2, 2014, Edge Capital sold the SumTotal first and second lien debt investment and received two wire transfers, totaling approximately $49,331,649.00. This amount was deposited into Edge Capital Investments, Ltd.'s account at Bermuda Commercial Bank.

98.     On November 17, 2014, Tamine wire transferred $45 million from Edge Capital Investments, Ltd.'s account at Bermuda Commercial Bank to Edge Capital Investments, Ltd.'s Mirabaud Bank account #509951 in Switzerland.

99.     Based on the above, through the SumTotal Debt Recapitalization, Brockman and Tamine were able to realize approximately an additional $8 million in gains from the investment of $49,100,000.00, of which $15 million is traceable to the Reynolds & Reynolds debt buyback fraud funds.

***Edge Capital Investments, Ltd.'s Mirabaud Bank Account # 509951***

100.    On or around April 13, 2013, in agreement with Brockman, Tamine opened a bank account for Edge Capital Investments, Ltd. at Mirabaud Bank in Switzerland.

101.    It appears a new account needed to be set up for Edge Capital Investments, Ltd. outside of Bermuda because another Bermuda bank, Butterfield Bank, had made a

connection between Brockman and the offshore structures.  Brockman did not like this discovery and directed Tamine to "extricate" themselves from Butterfield Bank.

102.    This account was funded with an $80 million wire transfer from Edge Capital Investment, Ltd.'s Bermuda Commercial Bank account.  A review of the account opening documentation reveals that the beneficial owner of the Mirabaud account was listed as Edge Purpose Trust.

103.    In December 2012, Tamine advised Brockman that it would be wise to change the ownership structure of Edge Capital Investments, Ltd. and Point Investments, Ltd. from the Massengill related trusts.  Tamine was concerned about changes in pending laws, as well as the ability of the government to connect the Massengill Trusts to Don Massengill.  Brockman agreed to a restructure of ownership, and Tamine created The Edge Purpose Trust. The Edge Purpose Trust documents state that the purpose of the trust is to retain ownership and control of all issued and outstanding shares of Edge Capital Investments Limited, and to hold and retain the shares in the capital of Edge Capital Investments, Ltd.  Although dated in January 2009, it appears based on metadata, the Edge Purpose Trust documents were actually created in 2013, after the December 2012 email.

104.    Tamine stated that he intentionally withheld information from Mirabaud Bank in setting up this account.  Specifically, Tamine excluded the fact that he took direction from Brockman on what would happen with the funds in this account.

105.    On April 18, 2013, Tamine emailed Brockman and informed him of the new account opening for Edge Capital Investments, Ltd. at Mirabaud Bank. Tamine informed

Brockman that he just wired $80 million into the account from the Edge Capital Investments, Ltd.'s Bermuda Commercial Bank account.  Tamine advised Brockman that Mirabaud thinks that Edge Capital was owned by a charitable trust and was comfortable with the explanations Tamine provided. On April 19, 2013, Brockman replied to Tamine that he was "surprised and happy that you were able to transfer such a large sum with so little hassle."]

***Financial Analysis of Mirabaud Bank Account #509951***

106.    A review of Edge Capital Investments, Ltd.'s Bermuda Commercial Bank account number 0680120070301 identified a wire transfer on April 16, 2013 of $80 million in commingled funds to Edge Capital Investments, Ltd.'s Mirabaud Bank account #509951. Prior to this transfer, Edge Capital Investments, Ltd's Bermuda Commercial account retained deposits traceable to Reynolds & Reynolds buyback proceeds ($2,563,588.04) since their initial deposit, received deposits, totaling $30,048,864.33, from investments of Reynolds & Reynolds debt buyback proceeds in a fixed deposit instrument; received bank interest, totaling $24,760.02; and and SumTotal Debt interest payments, totaling $1,231,825.34.    Accordingly, approximately $33,869,037.73 of this wire transfer is directly traceable to the wire fraud proceeds received from the Reynolds & Reynolds debt buyback scheme, or proceeds traceable to the original fraud proceeds, including bank interest and fixed deposit interest.

107.    As described above, on November 17, 2014, Tamine wire transferred $45 million from Edge Capital Investments, Ltd.'s account at Bermuda Commercial Bank to Edge Capital Investments, Ltd.'s Mirabaud account #509951 in Switzerland.  These funds

represented funds from Edge Capital Investments, Ltd.'s sale of the SumTotal first and second lien debt investment, which included $15 million in proceeds traceable to Reynolds & Reynolds debt buyback scheme and $30 million of funds traceable to and involved in money laundering.

108.    According to Tamine, as of the date of his initial cooperation in this case in October of 2018, over $125 million sourced to Edge Capital Investments, Ltd. was sitting in the Mirabaud Bank account in Switzerland.  Tamine provided documents showing that as of June 29, 2019, there was over $129 million in the Edge Capital Investments, Ltd.'s Mirabaud Bank account.

109.    Based on a review of records, since these initial transfers from Edge Capital's account at Bermuda Commercial Bank to Edge Capital Investments, Ltd.'s Mirabaud Bank account #509951, these funds have continued to be invested in general interest-earning investment vehicles.

110.    Accordingly, approximately $48,869,037.73 in proceeds directly traceable to the Reynolds & Reynolds debt buyback fraud scheme was deposited into Edge Capital Investments, Ltd.'s Mirabaud Bank account #509951.

111.    Moreover, at least an additional $30 million in funds traceable to or involved in money laundering was deposited into Edge Capital Investments, Ltd.'s Mirabaud Bank account #509951.

112.   On October 27, 2020, the United States obtained a seizure warrant for approximately $77,888,782.61 held and frozen in Mirabaud Bank account #509951.[3]

<u>CRIMINAL INDICTMENT</u>

113.   On October 1, 2020, a grand jury in the Northern District of California returned an Indictment, charging Robert T. Brockman with violations of 26 U.S.C. § 7201 (Tax Evasion), 31 U.S.C. §§ 5314 and 5322(b) (FBAR Violations), 18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution), 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), 18 U.S.C. § 1956(a)(1)(A)(ii) (Tax Evasion Money Laundering), 18 U.S.C. § 1956(a)(2)(B)(i) (International Concealment Money Laundering), 18 U.S.C. § 1512(b)(2)(B) (Evidence Tampering), and 18 U.S.C. § 1512(c)(1) (Destruction of Evidence).

114.   The wire fraud counts in violation of 18 U.S.C. § 1343 as charged in the Indictment were based on the Reynolds and Reynolds debt buyback scheme described above.  Because Deutsch Bank is the affected financial institution listed in the Indictment, the same conduct would constitute violations of 18 U.S.C. § 1344 (Band Fraud). In addition, the money laundering counts charged in the Indictment were based, in part, on the movement of Reynolds & Reynolds debt buyback scheme proceeds to Bermuda, and subsequently to Switzerland, as set forth in the Financial Analysis of Fraud Proceeds described above.

<u>VERIFICATION OF TED LAIR, SPECIAL AGENT</u>

---

[3] Based on the financials available at the time, the United States sought seizure of fewer funds than supported by the evidence described above.

INTERNAL REVENUE SERVICE-CRIMINAL INVESTIGATION

I, Ted Lair, hereby state and aver under the pains and penalties of perjury that I have read the foregoing Factual Basis for Forfeiture and that the facts and information contained therein are true.

_____
Ted Lair
Special Agent, IRS-Criminal Investigation

FIRST CLAIM FOR RELIEF

115.   The Plaintiff repeats and incorporates by reference the paragraphs above.

116.   By the foregoing and other acts, defendant 121 Ash Road constitutes property involved in a financial transaction designed to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of unlawful activity, and property involved in a monetary transaction in criminally derived property, in violation of 18 U.S.C. § 1956, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

SECOND CLAIM FOR RELIEF

117.   The Plaintiff repeats and incorporates by reference the paragraphs above.

118.   By the foregoing and other acts, defendant 121 Ash Road constitutes property involved in a monetary transaction in criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

THIRD CLAIM FOR RELIEF

119.    The Plaintiff repeats and incorporates by reference the paragraphs above.

120.    By the foregoing and other acts, defendant 121 Ash Road constitutes or was derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C).

## FOURTH CLAIM FOR RELIEF

121.    The Plaintiff repeats and incorporates by reference the paragraphs above.

122.    By the foregoing and other acts, defendant 121 Ash Road constitutes or was derived from proceeds traceable to bank fraud, in violation of 18 U.S.C. § 1344, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C).

## FIFTH CLAIM FOR RELIEF

123.    The Plaintiff repeats and incorporates by reference the paragraphs above.

124.    By the foregoing and other acts, defendant approximately $77,888,782.61 held and frozen in Mirabaud Bank account #509951 constitutes property involved in a financial transaction designed to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of unlawful activity, and property involved in a monetary transaction in criminally derived property, in violation of 18 U.S.C. § 1956, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

## SIXTH CLAIM FOR RELIEF

125.    The Plaintiff repeats and incorporates by reference the paragraphs above.

126.    By the foregoing and other acts, defendant approximately $77,888,782.61 held and frozen in Mirabaud account #509951 constitutes property involved in a monetary

transaction in criminally derived property, in violation of 18 U.S.C. § 1957, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(A).

## SEVENTH CLAIM FOR RELIEF

127.    The Plaintiff repeats and incorporates by reference the paragraphs above.

128.    By the foregoing and other acts, defendant approximately $77,888,782.61 held and frozen in Mirabaud account #509951 constitutes or was derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C).

## EIGHTH CLAIM FOR RELIEF

129.    The Plaintiff repeats and incorporates by reference the paragraphs above.

130.    By the foregoing and other acts, defendant approximately $77,888,782.61 held and frozen in Mirabaud account #509951 constitutes or was derived from proceeds traceable to bank fraud, in violation of 18 U.S.C. § 1344, and is therefore forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States prays for entry of a final order of forfeiture for the defendant asset in favor of the United States, that the United States be authorized to dispose of the defendant asset in accordance with law, and that the Court enter a finding of probable cause for the seizure of the defendant asset and issue a Certificate of Reasonable Cause, pursuant to 28 U.S.C. § 2465.

DATED this 18th day of March, 2021.

Respectfully submitted,

MATTHEW T. KIRSCH
Acting United States Attorney

35

By:   *s/ Tonya Andrews*
Tonya S. Andrews
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: 303-454-0100
Fax: 303-454-0405
Email: tonya.andrews@usdoj.gov