1

```
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
    Case No. 21-cv-796-MEH
 3  _____

 4  UNITED STATES OF AMERICA,

 5       Plaintiff,

 6  vs.

 7  121 ASH ROAD, BASALT, COLORADO, et al.,

 8       Defendants.
    _____
 9

10            Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for

12  the District of Colorado, commencing at 11:41 a.m., on July

13  10, 2022, in the United States Courthouse, Denver,

14  Colorado.

15  _____

16            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

18  _____

19                         APPEARANCES

20            TONYA ANDREWS, Attorney at Law, appearing for the

21  Plaintiff.

22            CLIFFORD STRICKLIN, Attorney at Law, appearing for

23  Claimant Henke Property, LLC.

24  _____

25                      STATUS CONFERENCE
```

2

```
 1                  P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5              THE COURT:  21-cv-796, USA vs. 121 Ash Road.
 6              How's everybody?
 7              MS. ANDREWS:  Good, Your Honor.  How are you?
 8              THE COURT:  Good.  Well, just give me a good old
 9   Section 1983 police beat-down any day.
10              How's private practice?
11              MR. STRICKLIN:  It's a blessing everyday.
12              THE COURT:  Really?
13              MR. STRICKLIN:  Living the dream.  Living the
14   dream.
15              THE COURT:  You like going to work?  I mean, we
16   could turn the record off if you want, but you actually like
17   going to work every day?
18              MR. STRICKLIN:  Actually, you know what, it -- I
19   always -- I've said this.  It's -- obviously, you miss being
20   on the side of righteousness and justice, you know.  I like
21   to think it's a different way of righteousness and justice
22   and helping people solve problems --
23              THE COURT:  Well, it is.
24              MR. STRICKLIN:  -- right?
25              THE COURT:  Yeah, maybe.  Yeah.
```

3

 1             MR. STRICKLIN:  And then there's this -- and then
 2   there's different challenges, right?  It's a whole new way
 3   of practicing law.
 4             THE COURT:  Yeah.
 5             MR. STRICKLIN:  Completely -- you know, you don't
 6   know how you good you guys have it not having to worry about
 7   --
 8             THE COURT:  So the challenge is this:  Is it going
 9   to be Disney World this year, or Disneyland, or is it going
10   to be Hawaii?
11             MS. ANDREWS:  Yes.
12             THE COURT:  No.  I'm just kidding.
13             MR. STRICKLIN:  I will say this though:  As one of
14   the few litigants before you recently, I am wearing shoes
15   today.  So I have the ability --
16             THE COURT:  So who was it?
17             MR. STRICKLIN:  Well, I think the Rainbow family.
18   You know, there was a --
19             THE COURT:  Oh, you saw that, huh?
20             MR. STRICKLIN:  There was a great picture of you
21   with the --
22             MS. ANDREWS:  Yeah.
23             THE COURT:  Actually -- so did you see, it was --
24   I just had a -- I mean, I had to maintain a straight face,
25   right, I just had to, but if you saw the Hobbit or any of

```
 1   the Lord of the Rings movies?
 2             MR. STRICKLIN:  Sure.
 3             THE COURT:  Their feet looked exactly like
 4   hobbits' feet, and they were about the size of hobbits.  A
 5   couple of them were at least.  So I thought --
 6             MR. STRICKLIN:  They toughen up over time.
 7             When I was -- when I came into the US Attorneys
 8   Office, I wanted to make a name for myself, so I volunteered
 9   to take over the petty docket, because it was a rotating --
10   it was a rotating deal at the time.  And I will honestly say
11   in all my service of -- you know, like 20-plus years with
12   the Department of Justice and various facets in law
13   enforcement, that -- those folks have the hardest job in the
14   world of going out to federal lands and --
15             THE COURT:  Were you up there in '06?
16             MR. STRICKLIN:  Pardon me?
17             THE COURT:  Were you up there in '06?
18             MR. STRICKLIN:  No, no --
19             THE COURT:  Because last time they were in
20   Colorado was '06.
21             MR. STRICKLIN:  I didn't come to Colorado until
22   2008.  I was well beyond petty docket things.  I know, I
23   just -- but to have, like, you know, those corps of
24   engineers or rangers or park rangers and what they have to
25   deal with, it's --
```

```
 1              THE COURT:  Yeah.  I mean, it was all on the
 2   forest.  So it was all forest service -- what do they call
 3   those guys?  Special agents, I think, don't they?
 4              What does forest service call its cops?
 5              MS. ANDREWS:  I want to say rangers, maybe.
 6              THE COURT:  Are they rangers?
 7              MS. ANDREWS:  Yeah.
 8              THE COURT:  I know the National Park Service calls
 9   them rangers.  I think they used to call them LEOs.  I'm not
10   sure.
11              I mean, it was -- it was different duty, you know,
12   and kind of -- it was a kind of a unique duty.  So --
13              MR. STRICKLIN:  Did anyone go to custody?
14              THE COURT:  No, but someone came armed, which is
15   lawful in a forest.  You just can't do it in a room.
16              MR. STRICKLIN:  If you'll recall the kangaroo
17   court, according to the Washington Post.
18              MS. ANDREWS:  Yes.
19              THE COURT:  The Court was.  I don't think I was.
20   I think I showed up and they changed their mind.
21              MR. STRICKLIN:  Okay.
22              THE COURT:  She actually talked to me and -- I
23   mean, I don't think there was anything unflattering about me
24   in the whole article.
25              MR. STRICKLIN:  No, no.  You looked -- it was very
```

```
 1    flattering.
 2              THE COURT:  Yeah.
 3              MR. STRICKLIN:  It looked like out there doing the
 4    Lord's work in the beauty of nature --
 5              THE COURT:  It was great.
 6              MR. STRICKLIN:  -- in the great courthouse.
 7              THE COURT:  It was beautiful and I had plenty of
 8    helpers, and, you know, it was all on the record.  So -- and
 9    they were -- so the biggest achievement was this:  Do you
10    know what he's talking about, the Rainbow Family?
11              MS. ANDREWS:  Oh, yes.
12              THE COURT:  Yeah.  And so there was one guy up
13    there who they later told me had a ten-year BOP sentence
14    for, I think, drugs and guns, but he was a rabble rouser,
15    and so at the end of my -- I gave an advisement in person.
16    They just wanted to hand out a written advisement to all of
17    them.  They had a stack of paper up there, and I thought,
18    you know, that's so unpersonable, and so I went up to the
19    edge of the police tape line, which is the official
20    courtroom.  So you had to get rid of your gun before you
21    entered the police tape line, and so they gave it to friends
22    or whatever, and at the end of my talk, which it was a nice
23    back and forth interactive process, this rabble rouser dude,
24    he said, Okay, then.  Everybody, let's all get up there and
25    plead not guilty.  And out the 100, six pled not guilty --
```

 1   or they didn't plea not guilty, they just said -- we don't
 2   take a plea then, because we do that in arraignment, but
 3   they asked for counsel.
 4           So six out of 100.  Everybody else pled.  So that
 5   was the biggest achievement was defeating that bit of
 6   wisdom, because I said, Hey, you know, you can listen to
 7   this guy.  You're right to do that.  Most people don't
 8   listen to that guy and they go ahead and make arrangements
 9   with the prosecutors.
10           So it was okay.  It --
11           MR. STRICKLIN:  I had -- one time when I was on
12   the bench, I had a gentleman that wanted to retain his own
13   counsel, even though he had appointed counsel.  One of the
14   finest lawyers in all of Dallas County wanted to represent
15   him, and I let the courtroom decide, like, to weigh in on
16   it.
17           So there was a whole courtroom full of people and
18   there was a vote.  It was, like, 102 to 2 to keep the
19   current counsel.  Unfortunately, defendant chose to go with
20   the two.
21           THE COURT:  Well, they are --
22           MR. STRICKLIN:  It didn't work out so well.
23           THE COURT:  They are anarchists.  So they don't
24   want to listen.  They call themselves the largest
25   non-organization of non-members in the world.  So there you

1  go.

2           MR. STRICKLIN:  Well, interesting stuff, for sure.

3           THE COURT:  All right.  Did we enter appearances

4  yet?

5           MS. ANDREWS:  Not yet.

6           MR. STRICKLIN:  Go ahead.

7           MS. ANDREWS:  Good morning, Your Honor.  Tonya

8  Andrews on behalf of the United States and sitting with me

9  at counsel's table is AUSA Kurt Vaughn and paralegal Jason

10 Haddick (ph).

11          THE COURT:  Thank you.

12          MR. STRICKLIN:  And Cliff Stricklin at King &

13 Spalding on behalf of defendants with Jared Lax, my

14 colleague.

15          THE COURT:  Thank you.  Lawyers are just

16 ridiculous sometimes.  Just ridiculous for the sake of being

17 disagreeable, you know.  They don't even think through the

18 positions that they take.

19          Yeah.  Well, you --

20          MR. STRICKLIN:  We're going to correct that view

21 today.

22          THE COURT:  No, no.  That -- you can't correct the

23 view.  You can reestablish and reaffirm that there are

24 certainly exceptions to the rule, and I'm counting on this

25 being the exception.

1      So what I know is Edge Capital is wanting to do an
2  answer on December 1st?
3      MR. STRICKLIN:  That's the other defendant.  We
4  are 121 Ash Road, so --
5      THE COURT:  Okay.
6      MR. STRICKLIN:  -- I don't know what they plan on
7  doing.
8      THE COURT:  Go ahead.
9      MS. ANDREWS:  Yeah, Your Honor.  Edge Capital
10 keeps kicking their answer with good reason, because
11 essentially, you know, the cooperator would be the person
12 filing the answer on their behalf and trying to minimize
13 discovery and, you know, in theory both parties, vis-a-vis
14 United States and Edge, believe that there is settlement to
15 be had, but that it's just difficult to do, again, while the
16 cooperator remains cooperating with the criminal case.
17     THE COURT:  Right, which is still pending?
18     MS. ANDREWS:  Yeah.  It's set for trial February
19 23rd, Your Honor.
20     THE COURT:  Wow.  That's a long ways out.  What's
21 the date of the --
22     MS. ANDREWS:  Yeah.
23     THE COURT:  What's the case number and who's it in
24 front of?
25     MS. ANDREWS:  It is in the Southern District of

1   Texas.

2              THE COURT:  Oh.

3              MS. ANDREWS:  And my apologies, Your Honor.  I
4   didn't bring that docket with me.  I thought I had it.

5              THE COURT:  No, but has it been pending for
6   months, or just --

7              MS. ANDREWS:  Well, Your Honor, so remember there
8   was the competency issue, and that just recently got ruled
9   on about six weeks ago -- yeah, that's right.  Towards the
10  end of May.

11             So now it's full steam ahead --

12             THE COURT:  Okay.

13             MS. ANDREWS:  -- but -- and, candidly, Your Honor,
14  that courtroom has been slow in its rulings and case
15  handling, so it's just a slower docket.

16             THE COURT:  This is the Brockman case?

17             MS. ANDREWS:  That's correct, Your Honor.

18             THE COURT:  I would say the problem is endemic to
19  the federal courts, at least as I know.  So that's Dallas?

20             MS. ANDREWS:  No.  Southern District Houston.

21             THE COURT:  Oh, Houston.

22             MR. STRICKLIN:  I have the case number if --

23             MS. ANDREWS:  Yeah.

24             MR. STRICKLIN:  Yeah.  It's 421-cr-9.

25             THE COURT:  '21 -- so it was filed in January of

1   2021.  All right.  Wow.

2              So yeah, it's just -- I hope it's the unusual case

3   that gets tried in 2 1/2 years in a criminal context.  Is

4   that right or not?

5              MS. ANDREWS:  I mean -- you know, it's just so

6   hard to know nowadays, Your Honor, because I don't know how

7   the Court feels, but -- and sort of from my perspective at

8   the U.S. Attorneys Office, it feels like everything got

9   paused and we're, like, in a bloat right now where, you

10  know, just putting things that were paused back on the

11  calendar due to COVID and then, you know, fitting in all of

12  the routine business.

13             So everything seems high in volume.

14             THE COURT:  Yeah.  Let's have that discussion in a

15  second after we go off the record.

16             What do we need to do on the record?

17             MS. ANDREWS:  Oh, yeah.  So on the record,

18  basically we have -- both sides, I think, would agree we've

19  been working.  We just haven't accomplished much.

20             We have done initial courtesy productions.  The

21  United States -- our office didn't have great access -- we

22  had access to the documents in the criminal case, but we

23  couldn't really manipulate them.

24             So we put them on hard drives and now they're

25  being re-uploaded so that we can actually do more fulsome,

1   sort of, just informal discovery.

2          We've agreed upon some search terms, and we get
3   back -- we basically get those hard drives back tomorrow is
4   our expected date.  I think the Court can see they just
5   filed an amended answer last week, so we're in the process
6   of reviewing that.

7          And then we just, generally, have been continuing
8   to work and discuss in terms of what we can do without
9   interfering with the criminal case going forward.  We're
10  working on protective orders, getting some -- we've reached
11  out to some experts, getting them designated, but I think I
12  can speak for both of us that we're going to need to
13  continue the August 15th date, discovery cut-off date, which
14  is presently on the calendar.

15         So we'll get a motion before the Court on that.

16         THE COURT:  Yeah.  I don't need a motion.  Just
17  tell me what you want.

18         MS. ANDREWS:  Okay.  Six months?  Now, we want to
19  continue to be held accountable to the Court, Your Honor,
20  and make sure -- because we understand we'll likely need to
21  push that out, but, you know, depending on if that trial
22  date gets firmed, all that stuff.

23         MR. STRICKLIN:  It's a challenging case, because
24  of the criminal case in Houston, you know, there are -- it
25  has been a claim of incompetency.  The judge found the

1  defendant to be competent recently and then set the trial
2  date.
3          You know, my experience in -- with these types of
4  things is that there will be another motion for competence
5  -- you know, incompetency coming up, which could easily kick
6  that trial date again.
7          THE COURT:  Well, do you want to -- so here's a
8  thing you could do:  We can administratively close the case.
9  You guys could continue to do whatever you want to.  The
10 Court's not going to say, Oh, my gosh.  You're actually
11 doing productive things in a closed case.  It just is off --
12 I mean, if you want me to put pressure on you, I can.  It's
13 an interesting concept, because I think there are lawyers
14 out there who want courts to put pressure on them rather
15 than doing it themselves, maybe because they want to tell
16 their client that it wasn't me, it was the court, I suppose,
17 but you guys don't have that issue?
18         MS. ANDREWS:  No.  I mean, from the government's
19 perspective, it's six of one, half a dozen of the other.  We
20 will continue to work on the case regardless of if it's
21 administratively closed.  We're not going to be able to
22 complete the case until something happens with the criminal
23 trial, because --
24         THE COURT:  Right.
25         MS. ANDREWS:  Right.  So --

```
 1              THE COURT:  Which is really uncertain.
 2              MS. ANDREWS:  Yeah.
 3              THE COURT:  So there's only one pressure on courts
 4   and that is getting things wrapped up in three years, right?
 5   Otherwise it goes on a report, which people who have Article
 6   III status don't care about --
 7              MS. ANDREWS:  I've notice.
 8              THE COURT:  -- but people who work for a living do
 9   care about.
10              MS. ANDREWS:  I've noticed.
11              THE COURT:  Yeah.
12              MR. STRICKLIN:  At this point, pressure -- some
13   pressure helps.
14              THE COURT:  Okay.
15              MR. STRICKLIN:  At this point.  And I just -- you
16   know, I don't -- we're not -- Edge Capital is -- you know,
17   if you see it on the complaint, it's $79,000,000 or
18   $78,000,0000.  So it's $80,000,000 in cash sitting there.
19   That's great.
20              We are a piece of property, and so costs for
21   litigation, you know, they mount up over time, even if
22   you're dormant, you know, or whatever it is.  They continue
23   to mount.  And so trying to minimize it -- I don't know when
24   -- you know, it's like everything has its time, and I don't
25   know when it is and when we will have to be -- you know, try
```

```
 1   to be more aggressive on this.
 2             It's definitely nuanced, though, because their
 3   main cooperator is the owner's -- the corporation's manager,
 4   and so, you know, that is our -- we've spoken with him and
 5   we've amended our answer accordingly, but there's going to
 6   be some tension there between the government and our
 7   manager.
 8             THE COURT:  Right.
 9             MR. STRICKLIN:  And so I think six months is --
10   we'd talked about it ahead of time.  I think six months is
11   reasonable.  They've been very reasonable along the way, I
12   think we are too, and, you know, I think there is some work
13   we can get done --
14             THE COURT:  Okay.
15             MR. STRICKLIN:  -- and then we'll go from there.
16             THE COURT:  So a 12/31 discovery deadline?
17             MS. ANDREWS:  Sounds good, Your Honor.
18             THE COURT:  All right.  And then do you want to
19   have a status conference right after that to see if things
20   are all wrapped up, and then we want to do a scheduling -- a
21   final pretrial order?
22             MS. ANDREWS:  I would almost do it before, like
23   this, Your Honor.
24             THE COURT:  Okay.  That's fine.
25             So get out your calendars, tell me if you're
```

```
 1   available -- is November -- early November sound like a

 2   plausible time?  Okay.

 3             So how about November 9th?  I'm on criminal duty.

 4   You could hang around and reminisce if you want.

 5             Like, at 11:15 on November 9th?

 6             MS. ANDREWS:  Works for the government, Your

 7   Honor.

 8             MR. STRICKLIN:  And for me.

 9             THE COURT:  Great.  Anything else today, Ms.

10   Andrews?

11             MS. ANDREWS:  No, Your Honor.  Thank you.

12             THE COURT:  Mr. Stricklin?

13             MR. STRICKLIN:  No, sir.

14             THE COURT:  Okay.  We're going to turn the record

15   off.

16             (Whereupon, the within hearing concluded at 11:57

17   a.m.)

18

19

20

21

22

23

24

25
```

```
1                    TRANSCRIBER'S CERTIFICATE

2            I certify that the foregoing is a correct

3    transcript, to the best of my knowledge and belief (pursuant

4    to the quality of the recording) from the record of

5    proceedings in the above-entitled matter.

6

7    /s/Dyann Labo                      November 17, 2022

8    Signature of Transcriber                 Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```